UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

Michael Newsome,

                              Plaintiff,

                                                           Case # 6:16-CV-06451-FPG
v.
                                                           DECISION AND ORDER

Richard Bogan, et al.

                              Defendants.

## INTRODUCTION

Plaintiff Michael Newsome ("Plaintiff") brings this 42 U.S.C. § 1983 ("Section 1983") action against Defendants Richard Bogan, Hugh Compton, Robert Howard, Jermiah Dresser, Mark Plyter, and the Wayne County Humane Society ("Humane Society" or "Society") (collectively, "Defendants") alleging that Defendants searched his apartment and seized his two dogs in violation of the Fourth Amendment.  In addition, Plaintiff alleges Defendants retaliated against him in violation of the First Amendment for declining to participate in a police interview by causing one dog to be euthanized and the other adopted.  ECF No. 30.

Under Federal Rule of Civil Procedure 56, Defendants filed a Motion for Summary Judgment of Plaintiff's Amended Complaint.  ECF No. 77.  Plaintiff filed a Cross-Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment ("Cross-Motion"), ECF No. 101, and Defendants filed a response, ECF No. 105.  Plaintiff replied to Defendants' response.  ECF No. 106.

For the reasons set forth below, Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part and Plaintiff's Cross-Motion is GRANTED in part and DENIED in

part.  Plaintiff's Fourth Amendment claims may proceed.  Plaintiff's First Amendment claim is dismissed.

## FACTUAL BACKGROUND

For several months in 2013, Plaintiff and Julie Emmel shared an apartment in Lyons, New York with two pit bulls, "Mouth" and "Jules." ECF No. 101-2 at 2.  On October 20, 2013, Emmel reported to the Lyons Police Department that Plaintiff had assaulted her in the apartment the evening before.  *Id*.  She provided a statement to Officer Brian Ritchie in which she authorized the Lyons Police Department to search the apartment for evidence of the assault and take photographs of the scene.  ECF No. 101-2 at 2; ECF No. 101-7 at 1.  The next day, Officer Ritchie and another Lyons police officer, Officer Costello, searched the apartment, gathered evidence of the assault, took photographs, and left.  ECF No. 101-2 at 2.  Shortly thereafter, the officers contacted Plaintiff to request his presence at the police station for questioning.  *Id*.  Plaintiff declined to comply with the request, directing the officers to contact his attorney.  *Id*.  In addition, after the search concluded, Officer Ritchie completed felony information charges, sought a warrant for Plaintiff's arrest based upon the information he received from Emmel and the evidence gathered during the search, and notified Bogan, Chief of Lyons Police, of the incident and search.  ECF No. 101-7 at 1; ECF No. 101-16 at 85.

On October 22, 2013, Emmel and her father, a former Lyons official whom Bogan testified that he had known for several years, asked members of the Lyons Police Department to accompany her to the apartment so she could safely gather her belongings and let the two dogs out because she worried Plaintiff may assault her again if he was there.  ECF No. 77-2 at 5.  Emmel had been staying with her parents since reporting the assault and did not intend to continue living at the apartment.  ECF No. 101-4 at 7.  At an unknown time on the same day, the Lyons Police

Department received the warrant they had sought for Plaintiff's arrest for the alleged assault.  ECF No. 101-7 at 1.  The warrant did not mention or authorize any action with respect to the dogs.  *Id.*

Accompanied by her father and an unidentified Lyons police officer, Emmel gathered her belongings from the apartment, attended to the dogs, and left.  ECF 101-4 at 7.  Later that afternoon, Bogan; Howard, animal control officer for the Village of Newark and animal cruelty investigator for the Wayne County District Attorney's Office; Compton, animal control officer for the Village of Newark; Dresser, sergeant with the Lyons Police Department; and Plyter, director of the Wayne County Humane Society paid a separate visit to the apartment, during which Bogan, Howard, and Compton entered the apartment through an unlocked back door and searched it a second time.  ECF No. 101-2 at 3; ECF No. 101-16 at 87.  Dresser and Plyter stayed outside to assist if necessary.  ECF No. 101-19 at 3; ECF No. 101-10 at 69.  With Bogan's assistance, Howard and Compton removed the dogs from the premises and, with Dresser and Plyter's assistance, brought them to the Humane Society.  ECF No. 101-2 at 3.  Howard testified that the dogs did not appear malnourished or dangerous at the apartment.  ECF 101-1 at 5.  One of the dogs, "Jules," was enclosed in a crate.  *Id* at 5.  Later that day, after the dogs were removed from the apartment, Emmel visited the Humane Society at Defendants' request and transferred ownership of the dogs to the Society, stating she could no longer care for them and had nowhere to keep them because she did not intend to remain at the apartment.  ECF No. 101-4 at 60-65.

Later the same day, after both Emmel and the group of Defendants had left the apartment, Plaintiff returned home and called the police to ask about the missing dogs, immediately noticing their absence.  ECF No. 101-2 at 3.  Plaintiff was told the dogs had been seized and Bogan and Plyter invited him to retrieve them from the Humane Society.  *Id.*  Plaintiff did not go to the Humane Society and did not contact the organization until the next day.  *Id.*  Plyter testified

Plaintiff's invitation to the Humane Society was part of a "ping" meant to locate and effect an orderly arrest of Plaintiff without incident. ECF No. 101-10 at 105-110.

On October 23, 2013, Plaintiff contacted the Humane Society, but was told by Plyter that the dogs may not actually be released if he came to the Society because they showed aggression and were considered "abandoned." ECF No. 101-2 at 3. Plaintiff also called the Lyons Police Department and alleges he was told by a receptionist that the dogs would not have been seized if he had come to the police station for questioning about the assault. ECF No. 101-2 at 3. When Plaintiff's call was transferred to Bogan, Plaintiff claims Bogan remarked "I see I got your attention now." ECF No. 101-8 at 75-76. During his calls, Plaintiff informed Bogan and Plyter that he intended to visit the Humane Society to retrieve the dogs, repeatedly claiming ownership of them. *See generally* ECF No. 101-2.

On October 24, 2013, Plaintiff was arrested by Lyons police officers for assault, without having visited the Society. ECF No. 101-2 at 4. On October 25, 2013, the Humane Society euthanized "Mouth" for "aggressive behavior." *Id*. On October 29, 2013, "Jules" was adopted from the Society. ECF No. 77-2 at 6. Plaintiff was eventually convicted of Assault First, Assault Second, and Criminal Contempt in Wayne County Court. ECF No. 77-2 at 6. Before his conviction, Plaintiff tried to retrieve the dogs through third parties, but was unsuccessful. *Id*.

On June 29, 2016, Plaintiff brought the present action. ECF No. 1. Plaintiff asserts three Fourth Amendment claims challenging: (1) the search of the apartment executed by Bogan, Howard, Compton, Dresser, and Plyter; (2) the seizure of the dogs from the apartment executed by Bogan, Howard, Compton, Dresser, and Plyter; and (3) the seizure of the dogs executed by the Wayne County Humane Society and Plyter when they caused one to be euthanized and the other adopted. In addition, Plaintiff brings a First Amendment retaliation claim stemming from his

refusal to submit to the police interview about the assault and the dogs' subsequent seizure, euthanization, and adoption. [1]

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment" if the moving party "shows that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). "Where the moving party demonstrates 'the absence of a genuine issue of material fact,'" *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Celotex Corp.*, 477 U.S. at 323), "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (1986) (emphasis in original). "Only disputes over facts that might affect the outcome of the suit under the governing law" are "material." *Id.* at 248. A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

---

[1] Plaintiff names two non-state Defendants, the Wayne County Humane Society and Plyter, employee of the Wayne County Humane Society, in this action. Plaintiff's Amended Complaints, ECF No. 16, 30, sufficiently pled state action. *See Newsome v. Bogan*, 795 F. App'x 72, 73 (2d Cir. 2020) (summary order). Defendants do not dispute state action, nor does Plaintiff brief the issue further. Because the issue is not in dispute, the Court assumes state action with respect to the Humane Society and Plyter for the purposes of this Decision and Order.

In deciding a motion for summary judgment, the Court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Angulo v. Nassau Cnty.*, 89 F. Supp. 3d 541, 548 (E.D.N.Y. 2015) (quoting another source). "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991). Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc*., 391 F.3d 77, 82–83 (2d Cir. 2004) (citations omitted).

But a "mere scintilla of evidence" in favor of the nonmoving party will not defeat summary judgment. *Anderson*, 477 U.S. at 252. A nonmoving party must do more than cast a "metaphysical doubt" as to the material facts; it must "offer some hard evidence showing that its version of the events is not wholly fanciful." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986); *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading....").

## DISCUSSION

For the reasons set forth below, Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part and Plaintiff's Cross-Motion is GRANTED in part and DENIED in part. Plaintiff's Fourth Amendment claims may proceed. Plaintiff's First Amendment claim is dismissed.

### I.    **Fourth Amendment**

### a.  Search of Apartment

Plaintiff alleges Defendants Bogan, Howard, Compton, Dresser, and Plyter searched his apartment in violation of the Fourth Amendment before the dogs were seized.   Defendants claim Plaintiff's co-tenant, Emmel, consented to the search.  In addition, Defendants claim their conduct is shielded from liability because they are entitled to qualified immunity.  The Court addresses each argument in turn and concludes Plaintiff's claim may proceed.

### i.  Consent

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend IV.  A search of private property must be conducted pursuant to a warrant, unless an exception, such as consent or exigent circumstances plus probable cause, applies.  *Camara v. Municipal Court of City & Cnty. of San Francisco*, 387 U.S. 523, 528-29 (1967); *Michigan v. Tyler*, 436 U.S. 499 (1978); *United States v. Isofia*, 370 F.3d 226, 230-31 (2d Cir. 2004).  That is, the Fourth Amendment is not offended by a warrantless, suspicionless search to which an individual consents.  *Florida v. Jimeno*, 500 U.S. 248, 250-51 (1991).  With respect to jointly leased property, "[a]ny co-tenant can consent to a search of a dwelling because co-tenants have common authority over the property."  *United States v. Rojas*, 906 F. Supp. 120, 129 (E.D.N.Y. 1995).

A search must not exceed the scope of the consent given.  *Florida v. Royer*, 460 U.S. 491, 500-01 (1983).  To determine the parameters of consent, courts "ask 'what would the typical reasonable person have understood by the exchange between the officer and the [consenting party]?'"  *Winfield v. Trottier*, 710 F.3d 49, 55 (2d Cir. 2013) (quoting *Jimeno*, 500 U.S. at 251). "The scope of a search is generally defined by its expressed object."  *Id.* (quoting *Jimeno*, 500 U.S.

at 251); *United States v. Ross*, 456 U.S. 798 (1982).  With respect to a search of a private residence, few courts "sanction entry […] based upon inferred consent."  *Fuqua v. Turner*, 996 F.3d 1140, 1151 (11th Cir. 2021); *United States v. Gonzalez*, 71 F.3d 819 (11th Cir. 2021).  In sum, "[t]he Fourth Amendment is satisfied when, under the circumstances, it is objectively reasonable for the officer to believe that the scope of the [consenting party's] consent permitted him to [conduct the search that was undertaken]."  *U.S. v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995) (quoting *Jimeno*, 500 U.S. at 249).  The ultimate question is "whether the officer had a reasonable basis for believing that there had been consent to the search."  *United States v. Sanchez*, 32 F.3d 1330, 1334-35 (8th Cir. 1994) (collecting cases).

Here, it is undisputed that Emmel was a co-tenant of the apartment and possessed "common authority" to consent to a search.  *Rojas*, 906 F. Supp. at 129.  Her name was on the lease with Plaintiff's.  When Emmel reported she had been assaulted by Plaintiff, she represented she was an occupant of the apartment, authorized the Lyons Police Department to search it for evidence of the assault, and it was searched the next day by Officers Ritchie and Costello.

Plaintiff, however, challenges the second search Defendants conducted the day after the first, arguing Emmel's consent authorized a search only to gather evidence pursuant to the assault investigation, not to seize the dogs a day after evidence was gathered.  Defendants argue (i) the consent Emmel provided when she reported the assault authorized their search and, (ii) in the alternative, Emmel provided a separate consent to the Lyons Police Department the day Emmel returned to the residence to gather her belongings.  In either instance, Defendants assert they reasonably believed Emmel consented to the search.  The Court addresses each argument in turn before concluding Defendants' first defense is without merit and a genuine dispute of material fact as to whether a separate consent was given precludes summary judgment for either party.

Defendants offer no evidence from which an officer could reasonably believe Emmel consented to the second search when she reported the assault.  As a threshold matter, no evidence suggests any Defendant knew anything about the scope of Emmel's initial consent because no Defendant spoke to Emmel, interacted with Emmel, or received any information regarding her consent to Officer Ritchie.  With respect to Bogan, although Officer Ritchie notified him of the assault and search, Defendants do not present evidence of whether Emmel's consent was shared with Bogan.  Moreover, Bogan testified, with respect to Emmel's initial consent, that he believed in such circumstances "[o]nce you're done processing and no longer securing the [crime] scene, the voluntariness of [Emmel's consent] would expire unless it was then renewed."  ECF No. 101-16 at 78.

While Bogan's subjective belief regarding the propriety of a search conducted under the circumstances alleged is not strictly relevant to the Court's objective inquiry, a lack of evidence linking any Defendant to the exchange in which Emmel's consent was given supports an inference that an officer under the circumstances could not have reasonably believed Emmel consented to the challenged search when she reported the assault.

Bogan's testimony alludes to a second problem with Defendants' argument.  Assuming Defendants had adequately alleged any Defendant possessed knowledge of Emmel's consent, Defendants maintain the search was justified because Emmel did not affirmatively withdraw such consent or expressly limit her consent to one visit.  The Court disagrees.  First, the law imposes no such duty upon a consenting party.  Second, the "express object" of the search authorized by Emmel cannot possibly be said to include the removal of the dogs pursuant to an abandonment investigation.  The "express object" of the search Emmel authorized was to gather evidence of the

assault and take photographs, nothing more. *Jimeno*, 500 U.S. at 251. The "express object" of the search was fulfilled a day before the challenged search, on October 21, 2013.

In sum, in the absence of any evidence from which an officer could believe otherwise, there is "no reasonable basis for believing that [Emmel] had [consented] to the [challenged] search" when she reported the assault to Officer Ritchie. *United States v. Sanchez*, 32 F.3d 1330, 1334-35 (8th Cir. 1994) (collecting cases). No Defendant appears to have had personal knowledge of such consent and, even they did, a "reasonable person" in like circumstances would have understood the scope of the consent Emmel provided to be limited to gathering evidence of the assault. *Winfield v. Trottier*, 710 F.3d 49, 55 (2d Cir. 2013) (quoting *Jimeno*, 500 U.S. at 251). Accordingly, the Court rejects Defendants' claim that Emmel's initial consent authorized the challenged search.

In the alternative, Defendants claim Emmel provided a second consent to search the apartment. Defendants allege Emmel expressly authorized the Lyon Police Department to enter the apartment for the purpose of removing the dogs on the day Emmel returned to the apartment to gather her belongings. Plaintiff argues Defendants' deposition testimony contradicts this claim such that Defendants' evidence of a second consent cannot be credited.

Here, there is a genuine dispute of material fact as to whether a second consent was given. As a threshold matter, Plaintiff observes that the individual or officer that allegedly obtained a second consent from Emmel and conveyed such consent to the Lyons Police Department or any Defendant is not identified in any briefing. Defendants do not explain how the Lyons Police Department or any Defendant may have received Emmel's consent or knowledge of such consent. Still, Bogan, Plyter, and Emmel submitted affidavits in which each claim Emmel expressly authorized Defendants' entry into the apartment to remove the dogs. Plaintiff, however, argues

that Defendants' affidavits cannot be credited because they are inconsistent with each affiant's deposition testimony. Emmel, for example, testified that she did not learn about Defendants' search or the removal of the dogs until after the dogs had been brought to the Humane Society. Emmel testified further that she did not know who prepared her affidavit attesting to her consent and that she "just read it and signed it." ECF No. 101-4 at 27. Plyter, in his deposition, could not state who provided the alleged second consent to enter the home. Bogan, as discussed, testified that he never spoke with Emmel, but maintained in his testimony that the Lyons Police Department obtained permission from Emmel to enter the premises, without identifying how he acquired such knowledge. Bogan testified further that he periodically spoke with Emmel's father about the assault investigation and may have done so after Emmel and her father visited the apartment, but could not say for sure. *See* ECF No. 101-16 at 89. Moreover, besides Bogan and Plyter, no other Defendant present at the time of the search – Howard, Compton, or Dresser – testified to possessing knowledge of consent before the search. In sum, the only evidence adduced by Defendants to suggest a second consent was given are the three affidavits, only one of which is consistent with the corresponding affiant's deposition testimony. And even this affidavit does not set forth how the affiant came to know what the affiant claimed to know therein.

At the summary judgment phase, a court must not "weigh evidence" and must "eschew credibility assessments." *Angulo v. Nassau Cnty.*, 89 F. Supp. 3d 541, 548 (E.D.N.Y. 2015). Accordingly, the Court concludes that the inconsistencies between the affidavits and deposition testimony, as well as the sparse evidence offered to link any Defendant to the exchange in which Emmel's second consent was allegedly given, create a genuine dispute of material fact as to whether a second consent was provided to search the apartment and seize the dogs. Absent such

11

consent, a reasonable jury could conclude an unlawful search occurred in violation of the Fourth Amendment.

## ii. Qualified Immunity

The Court now turns to Defendants' qualified immunity defense. For the reasons set forth below, the Court concludes summary judgment cannot be granted with respect to qualified immunity because material facts bearing on the availability of the defense are in dispute.

"The doctrine of qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Soto v. Gaudett*, 862 F.3d 148, 156 (2d Cir. 2017) (internal quotation marks and brackets omitted). To determine whether a defendant is entitled to qualified immunity, courts ask "whether the facts shown 'make out a violation of a constitutional right' and 'whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct.'" *Estate of Devine*, 676 F. App'x 61, 62 (2d Cir. 2017) (summary order) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). For a right to be "clearly established," the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635 (1987). It is not necessary to find a "case directly on point" in order to show that the law governing a plaintiff's claim is clearly established, but existing precedent must have placed the [constitutional] right "beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011). This is not to say that an official action is protected by qualified immunity "unless the very action in question has previously been held unlawful," *see Mitchell v. Forsyth*, 472 U.S. 511, 535, n. 12 (1985); but it is to say that "in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Even when a clearly established constitutional right is arguably violated, "an officer is entitled to qualified immunity if officers of reasonable competence would disagree on the legality of the action at issue in its particular factual context." *Walcyzk v. Rio,* 496 F.3d 139, 154 (2d Cir. 2007) (internal citations omitted); *see also Okin v. Vil. of Cornwall-On-Hudson Police Dept*., 577 F.3d 415, 433 (2d Cir. 2009). "[A] qualified immunity defense is established if […]it was objectively reasonable for the defendant to believe that his action did not violate such law." *Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir. 1996) (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)); *see also Cugini v. City of NY*, 941 F.3d 604, 611 (2d Cir. 2019).

In addition, because qualified immunity is designed to protect police officers from liability when their actions are objectively reasonable, courts are instructed to "resolve questions of reasonableness on summary judgment ... *where the material facts are not in dispute...* " *Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995) (emphasis added); *see also Hunter v. Bryant*, 502 U.S. 224, 227-28 (1991); *Roy v. Inhabitants of the City of Lewiston*, 42 F.3d 691, 694 (1st Cir. 1994); *Oliveira v. Mayer*, 23 F.3d 642, 648 (2d Cir. 1994). In cases where the facts underlying the availability of the defense are undisputed, a court may decide whether a defendant is entitled to qualified immunity. However, if determining the objective reasonableness of a defendant's conduct requires further fact finding, qualified immunity is appropriate for the jury. *See Lennon*, 66 F.3d at 421; *Oliveira*, 23 F.3d at 649; *Calamia v. City of New York*, 879 F.2d 1025, 1036 (2d Cir.1989). That is, if factual disputes "bear directly upon whether it was objectively reasonable" for a defendant to believe he was acting unlawfully, it is appropriate for a court submit the qualified immunity issue to a jury. *Oliveira*, 23 F.3d at 650.

Here, the objective reasonableness of a defendant's conduct under like circumstances turns on material facts that are in dispute; namely, whether Emmel provided a second consent and

whether Defendants had knowledge or any basis for believing such consent was given. That is, a genuine dispute of material fact bears "directly upon whether it was objectively reasonable" for an individual in like circumstances to believe the search was lawful. The Court accordingly cannot grant Defendants qualified immunity at this stage.

For these reasons, Defendants Motion for Summary Judgment is DENIED and Plaintiff's Cross-Motion for Summary Judgment is DENIED with respect to the search of the apartment.

### b.  Seizure of Dogs from Apartment

Plaintiff alleges Defendants seized his dogs in violation of the Fourth Amendment, arguing that he has a possessory interest in the dogs, that Defendants lacked consent to remove the dogs, and that the alleged abandonment and aggression of the dogs did not justify their seizure. Defendants contend that Plaintiff does not have a possessory interest in the dogs and therefore lacks standing to challenge the seizure, and further allege that Defendants obtained the consent of Emmel to seize the dogs. Defendants further allege the seizure was reasonable because the dogs were aggressive and abandoned. In addition, Defendants argue that they are entitled to qualified immunity. The Court considers each argument in turn below before concluding again that genuine disputes of material fact as to whether Emmel provided consent preclude summary judgment for either party with respect to Plaintiff's claim, as well as Defendants' qualified immunity defense.

### i.  Standing

Under the Fourth Amendment, a "seizure of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). "The unreasonable removal or killing of a companion animal constitutes an unconstitutional seizure of personal property under the Fourth Amendment." *Carroll v. County of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013). To claim an unconstitutional

14

seizure, "a party must first assert a possessory interest in an item seized." *United States v. Fields*, 113 F.3d 313, 320 (2d Cir. 1997). If a possessory interest is established, a court must then assess whether the seizure was reasonable under the Fourth Amendment, which requires a court to "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interest alleged to justify the intrusion and determine whether the totality of the circumstances justified the particular sort of seizure." *Carroll*, 712 F.3d at 651; *see also Soldal v. Cook Cty., Ill.*, 506 U.S. 56, 71 (1992).

Here, Plaintiff claims the dogs, "Mouth" and "Jules", were his. Plaintiff testified that he purchased "Mouth" from his friend "Mop", a Rochester dog breeder, in 2011, though he did not obtain a license for the dog. *See* ECF No. 101-8. Plaintiff further testified that he bought "Jules" from the same breeder when the dog was six weeks old in early 2017. *Id.* An affidavit submitted by an associate of Plaintiff at the time of the alleged purchase of "Mouth" corroborates the above claims. *See* ECF No. 101-20. In addition, Plaintiff offers statements made by Defendants during Defendants' attempts to locate and arrest Plaintiff that the dogs belonged to Plaintiff, allegedly showing Defendants' belief that Plaintiff retained an interest in the dogs insofar as he may seek to retrieve them pursuant to Defendants' "ping" operation.

Defendants contend Emmel, not Plaintiff, owned both "Mouth" and "Jules". Defendants offer evidence that Emmel had licensed "Mouth" in her name, paid veterinary bills for both dogs, and cared for both dogs during the period in which she lived with them at the apartment with Plaintiff. In addition, on a previous occasion unrelated to the events giving rise to this litigation, Defendants claim Emmel paid a retrieval fee for "Mouth" to the Wayne County Humane Society. Emmel is also listed as an owner on "Mouth's" rabies vaccination certificate. While "Jules" was not licensed, Defendants argue Emmel took steps to do so.

In sum, there is a genuine dispute of material fact as to whether Plaintiff had a possessory interest in the dogs.  A jury could reasonably conclude from these facts that Plaintiff owned the dogs, at least partially.  Because Plaintiff may have a possessory interest in the dogs, the Court now addresses whether Emmel's consent or, in the alternative, the dogs' alleged aggression or abandonment justify the seizure.

### ii.  Consent

Like a search, an officer may seize private property "without violating the Fourth Amendment if the owner [] voluntarily gives consent." *United States v. Peterson*, 100 F.3d 7, 11 (2d. Cir. 1996).  "Whether an individual has given consent is essentially a fact-based inquiry that must be determined by the totality of the circumstances." *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993).  The ultimate question is, again, "whether the officer had a reasonable basis for believing that there had been consent." *United States v. Sanchez*, 32 F.3d 1330, 1334-35 (8th Cir. 1994) (collecting cases).

Here, as before, Defendants claim Emmel consented to the seizure of the dogs.  Defendants claim Emmel represented that she owned the dogs when she provided such consent.  Defendants offer the same evidence to show Emmel consented to the seizure as that offered to show Emmel's alleged consent to search.  In essence, Defendants contend with supporting affidavits that Emmel authorized the Lyons Police Department to search her apartment to seize the dogs.

Because there is a genuine dispute of material fact as to whether Emmel consented to the search of the apartment, the Court reaches the same conclusion with respect to a consent to the seizure of the dogs.  In the absence of such consent, a reasonable jury could find an unlawful seizure occurred in violation of the Fourth Amendment because Defendants do not allege the existence of a warrant, exigent circumstances, or probable cause.

With respect to Defendants qualified immunity defense, the principles previously articulated above apply with equal force here.  In short, the Court concludes that because a genuine dispute of material fact again bears directly upon the reasonableness of a defendant's conduct in like circumstances, summary judgment cannot be granted with respect to Defendant's qualified immunity defense on this claim.  *Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir. 1996) (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)); *see also Carroll*, 712 F.3d at 651 (establishing that the "unreasonable removal or killing of a companion animal, constitutes an unconstitutional seizure of private property under the Fourth Amendment"); *United States v. Place*, 462 U.S. 696, 701 (1983) (establishing that a seizure of private property without a warrant, consent exigent circumstances or probable cause, as alleged here, is "presumptively unreasonable.").

### ii. Reasonableness

The Court now addresses Defendants' claim that the seizure of the dogs was reasonable because the dogs were abandoned and aggressive, even if consent was not given.  In addition, the Court addresses Defendants' qualified immunity defense.  For the reasons set forth more fully below, the Court concludes Defendants' conduct may have been unreasonable and factual disputes again preclude summary judgment with respect to Defendants' qualified immunity defense.

As discussed, the "unreasonable removal or killing of a companion animal constitutes an unconstitutional seizure of private property under the Fourth Amendment."  *Carroll*, 712 F.3d at 651.  A seizure of private property without a warrant, consent exigent circumstances or probable cause, as alleged here, is "presumptively unreasonable." *United States v. Place*, 462 U.S. 696, 701 (1983).  If a possessory interest is established in the seized property, a court must then determine whether the seizure was reasonable under the Fourth Amendment by balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of

the governmental interest alleged to justify the intrusion and determine whether the totality of the circumstances justified the particular sort of seizure." *Carroll*, 712 F.3d at 651; *see also Soldal v. Cook Cty., Ill.*, 506 U.S. 56, 71 (1992).

In assessing the importance of governmental interests, courts are guided by, but not limited to, the following factors: risk to the safety of officers and the general public; reasonable belief that danger to the officer was imminent; the dog's behavior; destruction of evidence; the location of the dog at the time of the seizure and whether it was in a home or running free; whether there was time to devise a plan to control of the dog before the seizure; and whether the dog posed a danger to the officer or the public. *See Dempsey v City of Rochester*, No. 19-CV6780-EAW, 2020 WL 7047493, at *4 (W.D.N.Y Nov. 30, 2020); *Carroll*, 712 F.3d at 651; *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 975-76 (9th Cir. 2005).

The Court first addresses Plaintiff's alleged interests and the nature and quality of the intrusion upon them. The removal or killing of a pet dog is a severe intrusion "given the emotional attachment between a dog and an owner." *Carroll*, 712 F.3d at 651; *see also Hells Angels*, 402 F.3d at 975. "[P]rivate interests in dogs – and family pets especially – are highly significant since dogs have aptly been labeled 'Man's Best Friend,' and certainly the bond between a dog owner and his pet can be strong and enduring." *Anniskiewicz v City of Rochester*, No. 20-CV-6629-FPG, 2021 WL 1699731, at *4 (W.D.N.Y. Apr. 29, 2021). Because Plaintiff alleges ownership of the dogs, Plaintiff's interests are undoubtedly strong and the intrusion severe.

The governmental interests, on the other hand, appear weak. At least one dog, "Jules," was enclosed in a crate and not capable of interfering with officer safety. Destruction of evidence was not an issue because the evidence relevant to the assault investigation had been collected from Plaintiff's home before the dogs were seized. Moreover, both dogs were enclosed inside the home,

not running free in a manner that could potentially threaten officers or any member of the public. With respect to the condition of the dogs themselves, one Defendant, Howard, testified that the dogs did not appear malnourished or dangerous at the apartment.   With respect to the dogs' behavior, Defendants offer Plyter's testimony that he told Plaintiff that the dogs were abandoned and aggressive when Plaintiff contacted the Humane Society to inquire about the dogs, however it is worth noting Plyter did so shortly after inviting Plaintiff to retrieve the dogs.   This inconsistency and "backtracking," within the totality of the circumstances, supports an inference that the dogs' behavior may not have justified the seizure at the time of its execution.   Plyter's testimony further supports an inference that the dogs were seized pretextually in an attempt to locate Plaintiff and effect his arrest.

Relatedly, Plaintiff's multiple attempts to arrange for the dogs to be retrieved by him or third parties negate Defendants' claim that the dogs were abandoned.   In addition, Defendants' argument that Plaintiff's potential future arrest for the alleged assault justified the seizure is without merit.   Plaintiff's potential arrest does not extinguish any possessory interest he may have had in the two dogs, nor his ability to arrange for a third party to take care of the dogs, as discussed. In addition, Emmel's purported lack of intent to return to the premises, a day before the dogs' seizure, does not by definition constitute abandonment by Plaintiff.

Accordingly, taking the facts in the light most favorable to Plaintiff, the Court concludes that, under the totality of the circumstances, Defendants' seizure may have been unreasonable. The governmental interests alleged do not appear to outweigh the nature and quality of the Fourth Amendment interests Plaintiff asserts.   There is little basis for Defendants to assert the seizure was reasonable against the factors enumerated above, absent Emmel's consent.   But, given factual

disputes bearing directly on the reasonableness of Defendants' conduct, qualified immunity is again inappropriate at this juncture.

In sum, because there are genuine issues of material fact as to (i) whether Emmel consented to the seizure of the dogs, (ii) whether Plaintiff has a possessory interest in the dogs, and (iii) the dogs' circumstances at the time of the seizure, summary judgment cannot be granted on the merits or on qualified immunity.

For these reasons, Defendants' Motion for Summary Judgment is DENIED and Plaintiff's Cross-Motion is DENIED with respect to the seizure of the dogs from the apartment.

### c.  Euthanization and Adoption of Dogs

Plaintiff alleges the Humane Society and Plyter executed an unreasonable seizure in violation of the Fourth Amendment by euthanizing "Mouth" and facilitating the adoption of "Jules."  Defendants renew their claim that Plaintiff lacks a possessory interest in the dogs and claim that, even if Plaintiff had a possessory interest, their conduct was reasonable because Emmel represented ownership when she transferred them to the Society.  Defendants further assert they are entitled to qualified immunity.  The Court concludes that Defendants' seizure may have been unreasonable because Plaintiff's possessory interest in the dogs is in dispute and Plaintiff attempted to retrieve the dogs before the seizure.  Further, because Plaintiff's alleged possessory interest bears on the reasonableness of Defendants' conduct, Defendants are not entitled to qualified immunity at this stage of proceedings.

As stated, the unreasonable removal or killing of a companion animal constitutes an unconstitutional seizure of personal property under the Fourth Amendment.  *See Carroll v. County of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013); *Fabrikant v. French*, 691 F.3d 193, 215-16 (2d Cir. 2012).  If a possessory interest is established in seized property, a court must then assess whether

the seizure was reasonable under the Fourth Amendment, which requires a court to "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interest alleged to justify the intrusion and determine whether the totality of the circumstances justified the particular sort of seizure." *Carroll*, 712 F.3d at 651; *see also Soldal v. Cook Cty., Ill.*, 506 U.S. 56, 71 (1992).  In assessing the importance of governmental interests, courts are guided by, but not limited to, the list of factors enumerated previously.

As discussed, assuming Plaintiff has a possessory interest in the dogs, his private interests are undoubtedly strong and the alleged intrusion severe.  The government interests alleged appear, again, relatively weak.  Because Defendants brought the dogs to the Humane Society, the government lacked an interest in protecting the public from the dogs, if they were in fact aggressive.  Moreover, the dogs were confined indoors while secured at the Humane Society, supporting an inference that alleged dangerous behavior did not justify the seizure.  In addition, with respect to the physical condition of the dogs, testimony has been offered that the dogs were not unhealthy or malnourished.

Defendants nevertheless maintain that the seizure was reasonable because Emmel transferred ownership of the dogs after they arrived at the Humane Society and represented that she was the owner when she did so.  Defendants argue that Plaintiff's attempts to retrieve the dogs from the Humane Society after the fact do not disturb such a conclusion.  The Court is not persuaded.  As stated, Plaintiff alleges that he sought to retrieve the dogs after they were removed from the apartment and brought to the Society.  He further alleges Plyter said he could retrieve the dogs, before later informing Plaintiff the dogs would not be released because they were aggressive and abandoned, supporting an inference that the dogs were seized to locate Plaintiff.  If Plaintiff in fact held a possessory interest in the dogs and represented such interest to the Humane Society

when he contacted them to retrieve them, a reasonable jury could conclude that, under the totality of the circumstances, their subsequent euthanization and adoption of the dogs were unreasonable and perhaps linked to Defendants' assault investigation.  Accordingly, Plaintiff's claim cannot be dismissed on the merits.

With respect to Defendants' qualified immunity defense, while no case is "directly on point" in establishing that "the unreasonable removal or killing of a companion animal" in the context alleged violates the Fourth Amendment, the right in question is "sufficiently clear that a reasonable official" in like circumstances would "understand that what he is doing violates that right." *Carroll v. County of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013); *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).  As discussed, to be clearly established, "[t]he very action in question" need not have "previously been held unlawful," but the "unlawfulness must be apparent" to defeat a defendant's qualified immunity defense.  *Anderson*, 483 U.S. at 641.  Here, Plaintiff alleges he owned the dogs allegedly abandoned and sought to retrieve them before one was killed and the other adopted.  If Plaintiff had a possessory interest in the dogs, a reasonable jury may find that Defendants' conduct was unreasonable.  Because the ownership of the dogs' is in dispute and bears directly upon whether a defendant in like circumstances may reasonably believe their conduct was lawful, Defendants cannot be granted qualified immunity at this stage.

Accordingly, Plaintiff's Motion for Summary Judgment is DENIED and Defendants' Cross-Motion is DENIED with respect to this claim.

## II.   First Amendment

### a.   Retaliation

Plaintiff alleges Defendants retaliated against him in violation of the First Amendment by seizing, euthanizing, and facilitating the adoption of the dogs because he declined to submit to a

police interview about the assault.  Defendants argue the claim should be dismissed because Plaintiff's conduct is not protected by the First Amendment, he does not own the dogs, and the seizure, death, and adoption of the dogs were not causally connected to Plaintiff's refusal to participate in the interview. Defendants additionally claim they are entitled to qualified immunity. For the reasons stated below, the Court concludes that Defendants are entitled to qualified immunity with respect to this claim because the right Plaintiff asserts is, unlike the rights previously asserted in this action, not clearly established in law.

To raise a First Amendment retaliation claim, a plaintiff must show that he "engaged in conduct that was constitutionally protected and that retaliation against the protected conduct was a substantial or motivating factor in the defendant's actions." *Blue v. Koren*, 72 F.3d 1075, 1082 (2d Cir. 1995).  In other words, a plaintiff must show "(i) that the speech or conduct at issue was protected, (ii) that the defendant took adverse action against the plaintiff, and (iii) that there was a causal connection between the protected speech and the adverse action."  *Burns v. Martuscello*, 890 F.3d 77, 84 (2d Cir. 2018) (quoting *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015)).

### i.  Protected Conduct and Qualified Immunity

As a general matter, the First Amendment protects not only the "right to speak freely[,]" but the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).  State attempts to force an individual to speak or compel participation are a "severe intrusion on the liberty and intellectual privacy of an individual." *Burns v. Martuscello*, 890 F.3d 77, 84 (2d Cir. 2018).  A citizen's "right to decline to speak" is most salient where a citizen is asked to promote or express an "ideological or political point of view" one does not find acceptable and declines to do so.  *Wooley*, 430 U.S. at 715 (holding that New Hampshire could not compel its citizens to advertise the slogan "Live Free or Die" on their license plates); *W. Va. State Bd. of Educ. V.*

23

*Barnette*, 319 U.S. 624, 637 (1943) (holding that a state cannot require students to salute the American flag).  Protections of the First Amendment right to decline to speak are not, however, limited or confined to ideological or political speech; rather, they extend to a litany of "individual matters of opinion and morality," *Wooley*, 430 U.S. at 715.  The integrity of one's mind and freedom to make expressive choice lie squarely within "the sphere of intellect and spirit which it is the purpose of […] our Constitution to reserve from all official control[.]"  *Burns* 890 F.3d at 86 (quoting *Wooley*, 430 U.S. at 715).

Such matters include a citizen's right to decline to speak with government or law enforcement without reproach in other more varied contexts.  Generally, an individual may refuse to make false statements or statements one believes are false.  *Jackler v. Byrnes*, 658 F.3d 225, 241 (2d Cir. 2011) (holding that a probation officer could not be disciplined for declining to misrepresent their views in a report critical of a colleague).  A prison inmate may refuse to make false statements for and provide information to the police.  *Burns v. Martuscello*, 890 F.3d 77, 89 (2d Cir. 2018).  The Second Circuit, in *Jackler* and *Burns*, relied upon *Wooley*'s recognition of fundamental principles of autonomy, intellectual integrity, and personal privacy; such principles, *Burns* held, undergird the First Amendment right to speak and not to speak without fear of government coercion or compulsion of a degree more expressly contemplated by neighboring provisions of the Constitution.

Indeed, Fourth Amendment jurisprudence has a well-settled analogue to the right to decline to speak: the right to "walk away from police questioning."  *Burns*, 890 F.3d at 91.  When an individual is approached or contacted by a law enforcement officer, the individual "need not answer any question put to him; indeed, he may decline to listen to the questions at all[.]" *United States v. Hopper*, 935 F.2d 484, 490.  The Second Circuit relied in part upon this right in *Burns* in

holding a prisoner's right to decline to provide information to law enforcement is protected by the First Amendment because such a right is "akin to the right, enjoyed by members of the public at large, to decline to participate in police questioning[.]" *Burns* 890, F.3d at 90.

No case in the Second Circuit has expressly held, however, that the right to decline to speak protects an individual's right to decline to participate in a police interview, as Plaintiff alleges here. This brings the Court to Defendants' qualified immunity defense. While Plaintiff may have a viable First Amendment claim, because no case in the Second Circuit has held that the right Plaintiff asserts, the right to decline to participate in police interview, is protected by the First Amendment, the right cannot be said to be "clearly established" for qualified immunity purposes. *McGowan v. United States*, 825 F.3d 118, 124 (2d Cir. 2016). Such a right is not, as it must be, "beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011). As stated, Defendants' alleged misconduct occurred in 2013. The Second Circuit decided *Burns* approximately five years after Defendants' alleged misconduct in 2018. While *Burns* offers support for the application of the First Amendment right Plaintiff asserts in this action, it is rudimentary that such support must, for qualified immunity purposes, arrive before a defendant's alleged misconduct occurs. A reasonable defendant under the circumstances Plaintiff alleges would not be on notice that their alleged misconduct violated a constitutional right.

Accordingly, Defendants' are entitled to qualified immunity with respect to Plaintiff's First Amendment retaliation claim. For this reason, Defendants' Motion for Summary Judgment is GRANTED and Plaintiff's Cross-Motion is DENIED with respect to this claim.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part and Plaintiff's Cross-Motion is GRANTED in part and DENIED in part.

Plaintiff's Fourth Amendment claims may proceed. Plaintiff's First Amendment claim is dismissed.

IT IS SO ORDERED.

Dated: July 27, 2022
      Rochester, New York

_____
HON. FRANK P. GERACI, JR.
United States District Judge
Western District of New York